UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| DANIEL ARNOLD, JR., | ) |
| Plaintiff, | ) ) ) |
| v. | ) NO. 2:21CV266-PPS/JPK ) |
| INDIANA HARBOR BELT RAILROAD COMPANY, | ) ) ) ) |
| Defendants. | ) ) |

**OPINION AND ORDER**

Plaintiff Daniel Arnold, Jr. brings this action against his employer, Indiana Harbor Belt Railroad Company, alleging the railroad's liability under the Federal Employers' Liability Act for injuries Arnold sustained on February 21, 2021. Arnold slipped and fell on ice in the rail yard's parking lot that day as he was about to start his shift. The railroad now seeks summary judgment. The question presently before me is a simple one to state but a difficult one to apply: was Arnold covered by the Act while traversing the parking lot on his way to start his day? As discussed in detail below, after touring a century's worth of FELA cases, I conclude that, in this case, the question is one only a jury can answer. So the railroad's motion for summary judgment will be denied.

**Undisputed Facts**

Plaintiff Daniel Arnold, Jr. was hired on at the Indiana Harbor Belt Railroad Company in 2010. [DE 31 at ¶32.] In his workday as a conductor, Arnold estimates that he walks between five and ten miles per day, in all weather conditions. [DE 29 at ¶1.]

The railroad provides employees spikes to wear on their boots during winter months. [*Id*. at ¶2.]  Because conductors walk in all weathers, including snow and ice, IHB requires conductors to wear spiked boots while on duty when existing snow or ice conditions warrant.  [*Id*. at ¶3.]  Arnold has never fallen while wearing his spiked boots. [*Id*. at ¶4.]

On February 22, 2021, Arnold parked his truck in IHB's Michigan Avenue parking lot around 7:32 a.m.  [DE 29 at ¶14.]  His shift was scheduled to start at 7:50 a.m.  [*Id*. at ¶15.]  It was Arnold's habit, on days when he arrived to work early, to sit in his truck and listen to the radio.  [*Id*. at ¶16.]  He did so on the day of his injury.  [*Id*. at ¶17.]  Arnold knew that it was cold and icy out and knew that there was a chance of falling when he exited his truck, but he decided to exit the vehicle wearing his tennis shoes.  [*Id*. at¶5.]  Plaintiff slipped and fell on "black ice" that was not readily visible. [*Id*. at ¶6.]  He exited his vehicle and fell a few minutes before 7:40 a.m.  [*Id*. at ¶18.]

At the time of the incident, Arnold had a pair of work boots equipped with spikes provided by IHB on the floor of his pickup truck.  [*Id*. at ¶19.] But Arnold decided to wear his tennis shoes when he got out of the truck, and that's what he was wearing when he slipped and fell.  [*Id*. at ¶¶20, 21.]  Arnold admits that he was not on duty at the time he fell.  [*Id*. at ¶22.]  Because he was not on duty yet, Arnold was not wearing his personal protective equipment, including his spiked boots, high-visibility vest, hearing protection, or safety glasses, when he tumbled. [*Id*. at ¶23.]

After falling, Arnold got up and walked to the yard office at approximately 7:39 a.m. [*Id*. at ¶24.] He told the Yardmaster that he had fallen, and then ate his breakfast. [*Id*. at ¶26.] After eating his breakfast, Arnold decided he wanted to seek medical attention, and did not work on the day of his injury. [*Id*. at ¶¶27, 25.]

Trainmen are required by the T&E Safety Rules and Procedures, Rule 1000, to wear proper anti-slip safety footwear while on duty when existing snow or ice conditions warrant. [*Id*. at ¶28.] Arnold agrees that snow or ice conditions warranted anti-slip footwear when he exited his truck and walked into the Michigan Avenue yard office, but he did not put his spiked boots on because he was not on duty yet. [*Id*. at 30.] Arnold admits that he was not doing IHB's business or doing anything in furtherance of IHB's business when he fell, other than reporting for duty. [*Id*. at ¶31.] For purposes of summary judgment, IHB admits that when he fell Arnold hit his head on the step of his truck and injured his back. [DE 31 at ¶34.]

The walkway and the area near the IHB office had been salted, but Arnold does not believe the parking lot had been salted. [*Id*. at ¶7.] IHB has submitted a photograph that Arnold admits depicts the area of the Michigan Avenue parking lot where Arnold fell. [*Id*. at ¶8; DE 26-2..] A sign on the chain link fence bordering the lot reads "Employee Parking." [DE 29 at ¶8.] The photo also shows a taxi in the lot. [*Id*. at ¶9.]

Joshua Sanchez has been employed by IHB since 2004 and has been Director of Risk Management since December 2020. [DE 26-3 at ¶¶2-3.] He claims personal

3

knowledge of the facts stated in his declaration, and is familiar with the Michigan Avenue parking lot. [*Id.*] In his declaration, he attests that the Michigan Avenue parking lot, located at the northeast side of the yard office of IHB, is open not only to IHB employees but also to the public. [*Id.* at ¶4.] Sanchez gives examples of members of the public who are permitted to – and do – park in the lot, including taxi drivers, contractors, vendors, food delivery drivers, Federal Railroad Administration inspectors, attorneys, and employee's spouses. [*Id.* at ¶5.] Sanchez also testified in his deposition that the parking lot in question at the Michigan Avenue rail yard is open to the public. [DE 29-3 at 5-6.] Sanchez further testified that IHB does not issue parking stickers for employees to put in the windshield of their cars, and that IHB police do not patrol this parking lot to identify or have towed cars of non-employees. [DE 29-3 at 48.]

For his part, Arnold says that he has never seen Grubhub drivers, spouses or visitors park in the parking lot. [DE 29 at ¶12; DE 29-1 at 115-116.] Arnold asserts in his declaration, based on his familiarity with the lot, that it is not open to the public and that "[t]he only persons permitted to use the parking lot are employees and business invitees of the railroad, such as taxi drivers, contractors, FRA inspectors and other invitees." [DE 29-2 at ¶4.] Arnold asserts in his declaration that "the parking lot is designated by four signs, 'employee parking' and 'employee parking only'," and that "[o]ther parking spots are designated by signs 'trainmaster parking only' and 'yardmaster parking only.'" [DE 29-2 at ¶6; *see also* DE 31 at ¶58.] Arnold also contends

4

that "[t]he public is not permitted to park in employee only parking, is not permitted to park in yardmasters only or trainmaster only parking spots." [DE 20-2 at ¶8.]

IHB denies the existence of any "employee parking only" signs, and denies "that any of the signs wholly limit the yard parking lot to IHB employees or make any dangers in the lot unique to them." [DE 31 at ¶58.] Sanchez testified in his deposition that there is a sign in the lot that says "employee parking only in a portion of that parking lot; again, not meaning that the entire parking lot is exclusively for employee parking." [DE 29-3 at 16.] The latter clause of Sanchez's response (after the semi-colon) attempts to clarify the ambiguity of the former resulting from the lack of quotation marks indicating whether the sign referred to reads "employee parking" or "employee parking only." Sanchez testified he was aware of a sign that says "employee parking," but he didn't recall if any sign says "employee only parking." [DE 29-3 at 48.]

Both parties have offered supposed statements of fact on whether taxi drivers that use the Michigan Avenue parking lot are agents of IHB and are covered by FELA. [DE 29 at ¶¶10, 11; DE 26-3 at ¶6.] I will disregard the views of both plaintiff Arnold and IHB's Sanchez on this legal question. I note, however, that Arnold's blanket assertion that tax drivers using the lot are "agents of the IHB under FELA law" is not supported by the 1996 district court decision Arnold cites. [DE 29 at ¶10 (Response).] *Austin v. Soo Line R.R. Co.*, 1996 WL 539123, at *3 (N.D.Ill. Sept. 20, 1996), merely observes, unremarkably, that those "performing, under contract, operational activities" for a railroad are "agents" of the employer for purposes of FELA. If there were

5

evidence in this case that IHB uses taxis to transport railroad workers from one point to another, *Austin* would have some sway.  But there is no such evidence.

Whether or not taxi drivers in the parking lot are IHB employees (as opposed to whether they are covered by FELA) is a factual matter, or possibly a mixed question of law and fact.   IHB's Joshua Sanchez asserts personal knowledge of the fact that the taxi drivers are not IHB employees.  [DE 26-3 at ¶¶3, 6.]  Arnold asserts in his declaration personal knowledge that taxi drivers that use the parking lot are "business invitees of the railroad," and are "agents of the railroad and drive employees around the system."  [DE 29-2 at ¶¶3, 5.]  "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed.R.Evid. 602.  Sanchez's position as IHB's Director of Risk Management appears likely to provide a basis for his personal knowledge of whether IHB employs the taxi drivers.  By contrast, Arnold's declaration contains no explanation for his having personal knowledge that the taxi drivers are "business invitees" or "agents of the railroad," both of which are legal conclusions.  Neither does Arnold's deposition testimony address the taxi drivers other than, when asked if taxi drivers ever park in the area where he fell,  Arnold responding "Probably sometimes, I'm sure." [DE 29-1 at 115.]

The road from Michigan Avenue leading into the IHB lot is gravel and unmarked.  [DE 31 at ¶¶106, 110.]  This drive runs immediately adjacent to tracks on which trains operate.  [*Id*. at ¶¶107, 110.]  Tracks also run through the parking area,

apparently with no barrier that prevents anyone from crossing the tracks on foot. [*Id*. at ¶109.]

## Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party opposing summary judgment may not rely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).  Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

FELA provides a general definition of railroad worker injuries for which a railroad is liable, in 45 U.S.C. §51.  Here I break the provision down into its elements as relevant to this case:

- Every common carrier by railroad while engaging in commerce....,
- shall be liable in damages to any person suffering injury **while he is employed by such carrier in such commerce**, ....
- for such injury or death resulting in whole or in part from the negligence of any of the [agents] of such carrier,
- or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works...or other equipment.

As noted above, the issue raised by the railroad's summary judgment motion is whether Arnold was injured "while he [was] employed by such carrier in...commerce."

7

The railroad argues that, as a matter of law on the undisputed facts, Arnold was not covered by FELA at the time of his fall on the morning of February 22, 2021.

Arnold argues in response that the question presented is one that is generally decided by a jury rather than on summary judgment. [DE 28 at 2-6.] Arnold cites *Guerrero v. BNSF Railway Co.*, 929 F.3d 926 (7th Cir. 2019), in which the Seventh Circuit said that "scope of employment...is a question of fact for the jury in an FELA case." *Id*. But this observation merely signifies that the issue is not a pure question of law. It doesn't mean it is a matter impervious to determination on summary judgment. Indeed, the case *Guerrero* cites for the proposition makes this plain, as it confirms that scope of employment questions can be determined on summary judgment if there is no genuine issue of material fact. *Wilson v. Chicago, Milwaukee, St. Paul, and Pacific R. Co.*, 841 F.2d 1347, 1354 (7th Cir. 1988).

In a particularly pithy opinion in *Baker v. Texas & P. Ry. Co.*, 359 U.S 227, 228 (1959), the Supreme Court reversed a trial court's directed verdict on a FELA scope of employment question, warning that "[o]nly if reasonable men could not reach differing conclusions on the issue may the question be taken from the jury." As I have struggled with the evidentiary record and the parties' arguments in this case, I am mindful of *Baker*'s quotation from *Tennant v. Peoria & Pekin Union R. Co.*, 321 U.S. 29, 35 (1944): "The very essence of (the jury's) function is to select from among conflicting inferences and conclusions that which it considers most reasonable."

With those broad propositions in mind, it's necessary to survey the landscape of FELA cases addressing this issue. Indeed, there's a rich history dating back more than 100 years, that considers similar questions about railroad workers injured en route to or from their work, whether during their commute or on railroad property. Let's begin with *Quirk v. New York, C., & St.L. R. Co.*, 189 F.2d 97, 98 (7th Cir. 1951), where the Seventh Circuit considered whether the decedent railroad employee "was engaged in his employment with the defendant" at the time of his death "so as to be entitled to the protection of the Act." Quirk was a general foreman for the New York, Chicago, and St. Louis Railroad Company. He died from injuries sustained in a car collision on his way home from the rail yard, while driving a car owned by the railroad which he was permitted to use for traveling over his work territory but also to commute to and from his home. The Seventh Circuit concluded "as a matter of law upon the undisputed facts that the Act was without application." *Id*. at 101.

*Quirk* quotes the Supreme Court's decision in *New York Central & Hudson River Railroad Co. v. Carr*, 238 U.S. 260 263 (1915): "Each case must be decided in the light of the particular facts with a view of determining whether, at the time of the injury, the employee is engaged in interstate business, or an act which is so directly and immediately connected with such business as substantially to form a part or a necessary incident thereof." As *Carr* was decided when FELA was limited to interstate commerce and did not cover intrastate railroad functions, the more general statutory term "commerce" can now be substituted for "interstate business" in this principle. *See*

9

*Quirk*, 189 F.2d at 98 n.1 (referencing the 1939 Amendment to the Act eliminating the intrastate exclusion).  In *Carr*, the Supreme Court stated that a railroad employee was within FELA's coverage "[i]f he is hurt in the course of his employment while going to a car to perform an interstate duty, or if he is injured while preparing an engine for an interstate trip,…although the accident occurred prior to the actual coupling of the engine to the interstate cars."  *Carr*, 238 U.S. at 263.

In *Erie Railroad v. Winfield*, 244 U.S. 170 (1917), the Supreme Court found that FELA applied to an employee who was struck by an engine while crossing tracks to leave the yard at the end of his shift.  "In leaving the carrier's yard at the close of his day's work the deceased was but discharging a duty of his employment.  Like his trip through the yard to his engine in the morning, it was a necessary incident of his day's work, and partook the character of that work as a whole, for it was not more an incident of one part than of another."  *Id*. at 173.

*Caillouette v. Balt. & Ohio Chi. Terminal R.R. Company*, 705 F.2d 243 (7th Cir. 1983), involved a switchman injured when he tripped and fell on railroad premises as he was making his way to the place of his duties several blocks distant.  The Seventh Circuit emphasized that "[t]he scope of FELA must be decided in light of the facts of each particular case."  *Id*. at 246.  Caillouette had entered the yard at a point far from his worksite that morning, and intended to call the yardmaster to request an engine to transport him to the end of the yard where he was to start work.  *Id*. at 245.  The railroad contended that these facts likened the case to "commuter cases in which subject

10

matter jurisdiction was held to be absent," such as *Quirk*. *Id*. The Seventh Circuit rejected that view, highlighting that the employee "had to, of necessity, cross some part of the worksite to reach the place where he was to report," and that he "was in an area not open to the public and hence was subject to dangers beyond those experienced by the commuting public." *Id*. at 246.

Another question of the scope of FELA employment arose in *North Carolina Railroad Co. v. Zachary*, 232 U.S. 248 (1914). A locomotive firearm named Burgess was killed as he crossed some tracks heading to the boardinghouse where he lived, just at the edge of the rail yard. This occurred in the middle of his work shift, when he presumably intended "shortly to depart upon his run, having just prepared his engine for the purpose." *Id*. at 260. The Supreme Court observed that there was "nothing to indicate this brief visit to the boarding house was at all out of the ordinary, or was inconsistent with his duty to his employer." *Id.* As a result, the court thought it "clear that the man was still 'on duty,' and employed in commerce, notwithstanding his temporary absence from the locomotive engine." *Id*. The Supreme Court held that the North Carolina Supreme Court had erred in holding that FELA did not apply, and the case was remanded for further proceedings, with the court noting that "with respect to the facts necessary to bring the case within the Federal act, there was evidence that at least was sufficient to go to the jury." *Id*. at 260-61.

In *Krysiak v. Pennsylvania R. Co.*, 270 F. 758 (3rd Cir. 1921), the trial court directed a verdict in favor of the railroad, and the plaintiff challenged the conclusion that the

11

decedent had not been employed in interstate commerce at the time of his injury. At the end of his shift, Krysiak exited the yard by crossing both the yard tracks and the main tracks of the railroad company, rather than by use of a stairway the railroad "had provided for the safety of its employees on leaving their work." *Id*. at 759. In dark and foggy conditions, Krysiak "stepped between the rails of one of the main tracks and was struck by a train coming from behind an obstruction." *Id*. The court held that because the employer had provided a safe way of exiting the place of employment but the employee, for reasons of his own convenience, had selected a dangerous way instead, he had "[a]t that moment...ended his employment and lost the status of an employe in interstate commerce." *Id*. at 760. "Later, when he was killed, he was not engaged in his employer's work, or in an incident to it, but was engaged in his own private concerns." *Id*.

In *Aldredge v. Baltimore & O.R. Co.*, 20 F.2d 655, 658-59 (8th Cir. 1927), the Eighth Circuit considered whether FELA covered a railroad employee injured as he made his way to work, a distance of half a mile from his home, walking along the defendant railway's tracks, not within the railroad yard. Aldredge was injured when he was struck by an object projecting from the side of a train car being run on the track. *Id*. at 656. The Eighth Circuit found the conclusion "unavoidable" that "plaintiff was not engaged in interstate commerce at the time of the accident." *Id*. at 660. The court explained: "He was not on duty; he was simply going to a place where he would be on duty. He was not actually performing any task in interstate commerce, nor was his

presence on the right of way of defendant a necessary incident to the performance of such task." *Id.*

In *Young v. New York, N.H. & H.R. Co.*, 74 F.2d 251 (2nd Cir. 1934), an employee's decision to make an extra train journey after work (free for him as an employee) to perform an errand that was of no consequence to his employer meant that his injury during that leg of travel was not covered by FELA. "Except that he wanted his street clothes left at Cedar Hill, into which to change, he could have gone home by trolley as the engineer did. Certainly the defendant had no conceivable interest in this; he was as good a fireman whether he went upon the streets of Springfield and New Haven in overalls or in street clothes." *Id.* at 253. Because his reasons for the arrangement "had nothing to do with his employment, and could scarcely concern his relations with the defendant," the employee "must arrange for it on his own responsibility" and FELA did not apply to his injury en route. *Id.*

In *Ponce v. Northeast Illinois Regional Commuter R.R. Corp.*, 103 F.Supp.2d 1051 (N.D.Ill. 2000), the court helpfully described cases in this area of the law by categorizing them as either "commuter" cases on the one hand or "traversing" cases on the other. In "commuter" cases, courts have generally held than employee injured off the work site while commuting to or from work is not covered by FELA. *Id.* at 1057. By contrast, in "traversing" cases, where an employee is injured on the work site while "attempting to report to or leave the job within a reasonable time of his or her shift" and exposed to risks that the public is not, FELA has generally been found to apply. *Id.*

13

Ponce worked as a coach cleaner for METRA.  After completing his shift and clocking out, Ponce exited the building, and crossed some blacktop and some tracks to reach the point at which he would board the METRA train he would ride home. Employees did not board the METRA train at a regular platform stop, nor in the same manner as other commuters, but instead by mounting steps and climbing through a trap door into the train's vestibule.  *Id*. at 1055.  On the day in question, Ponce was injured when the trap door came down on his hand and shoulder.  *Id*.  On cross-motions for summary judgment, the court held that FELA applied:  "the undisputed material facts establish that this case falls within the 'traversing' doctrine of *Caillouette*: Ponce was injured on METRA property, in close proximity to his actual work site, shortly after he punched out of his shift, as he boarded his employer's commuter train – at a stop and through an entrance not generally available to commuters."  *Id*. at 1058.

Both *Caillouette* and *Ponce* cite with approval *Bountiful Brick Co. v. Giles*, 276 U.S. 154 (1928), in which the Supreme Court considered a scope of employment question under the Utah Workmen's Compensation Act in the context of a brick company employee killed crossing the tracks of the adjacent rail yard on his way to work.  The route was frequently used, "well known to the company and carried on without objection on its part."  *Id*. at 157.  The court held that "employment includes not only the actual doing of the work, but a reasonable margin of time and space necessary to be used in passing to and from the place where the work is to be done," including passing "to or from his work by a way over the employer's premises."  *Id*.  at 158.

14

In *Getty v. Boston and Maine Corporation*, 505 F.2d 1226 (1st Cir. 1974), the First Circuit affirmed a directed verdict for the railroad on a FELA claim for an employee's injuries incurred when he slipped and fell on snow and ice while walking toward a platform to board his employer's train to get to work. The employee attempted to avoid application of the "commuter" line of cases by arguing that wintry weather made alternative routes unavailable, so that his situation should be likened to a situation where the employee was required to commute using a defendant's passenger train. *Id*. at 1227. The court rejected the argument: "where the choice is left entirely to the employee, we do not think that incidental practicalities should alter the general rule that the commuting employee is outside the course of his employment." *Id*. at 1228.

More recently in *Guerrero*, the Seventh Circuit corrected any impression that FELA scope of employment issues affect subject matter jurisdiction. *Id*. at 929. Instead, scope of employment is a limitation on the right to recover under FELA that "describes an element of the case." *Id*. *Guerrero* considers gray areas at the edges of FELA commuter cases "to show why the question of scope of employment is not a straightforward one." *Id*. at 931. *Guerrero* characterizes "traversing" cases of FELA coverage as "those in which an employee has just clocked out, or not yet clocked in, but is traversing the work site on her way to or from her assigned post when she is injured." *Guerrero*, 929 F.3d at 930. The opinion goes on to consider the factor whether the employee encountered dangers common to the public. *Id*. Ultimately, *Guerrero* was

15

decided on a different basis, without the court resolving the scope of employment issue. *Id.*

What principles can be extracted from this bevy of cases for the analysis of the facts here? The caselaw in this area has repeatedly advised that the scope of employment issue is fact intensive. There is also no precise legal test to be applied. "It has been well said of the question that '(e)ach case must be decided on its peculiar facts and ordinarily no one feature of the relationship is determinative.'" *Baker*, 359 U.S. at 228, quoting *Cimorelli v. New York Central R. Co.*, 148 F.2d 575, 577 (6th Cir. 1945). I consider a number of factors identified in the caselaw as relevant to the determination whether at the time of the incident Arnold was "discharging a duty of his employment" in a manner to be within the ambit of FELA. *Winfield*, 244 U.S. at 173. Because I cannot conclude as a matter of law that Arnold was not acting within the scope of his employment at the time he was injured, the railroad's summary judgment motion will be denied.

Arnold was present in IHB's parking lot because he was reporting for work. He did not report so much earlier than his scheduled start to raise reasonable questions about whether he was acting out of motives unrelated to his job, as in *Young*. IHB had the ownership responsibility to maintain the parking lot for its intended users, who clearly included IHB employees. Although Arnold was reporting for duty reasonably close to the start of his shift and on railroad property, whether or not FELA covers Arnold's accident may be impacted by whether he was in an area where the general

16

public faced the same risks, per *Ponce*, *Caillouette*, and *Guerrero*. This is why the parties have fought so hard over whether the lot was for employee parking only. But I think their characterization of the issue ("Does IHB allow members of the public in the lot?") misses the point. Rather than a determination of who is *allowed* to use the lot, I think the pertinent question is, as a practical matter, who uses the lot.

      For its relevance to the application of FELA, the consideration is whether the danger to the employee was particular to him as an IHB employee or a danger "experienced by the commuting public." *Caillouette*, 705 F.2d at 246. *Ponce* speaks in terms of the accident site being railroad "property which is not open to the general commuting public." *Ponce*, 103 F.Supp.2d at 1054. The situation here is murky on that point. The undisputed facts presented suggest that this parking lot is not regularly used by the public in the same sense as a public street as in *Quirk* or a public commuter train as in *Getty*, "commuter" cases where FELA was found not to apply. But neither is the lot an area that is not open to the public at all, such as the tracks located well within a rail yard in *Zachary*.

      Access to the lot is via an unpaved and unmarked drive, but there is no indication that it is gated or otherwise not generally accessible to any vehicle or pedestrian. From the images that have been submitted, it's unclear whether the parking lot is paved. It is not large. The live railroad tracks crossing through it present obvious dangers, with no safety barriers but vehicles parked on either side suggesting people may regularly cross the tracks. IHB's examples of other users of the parking lot

17

(contractors, vendors, inspectors, food delivery drivers) are not the general public, but are all parties who would be present because of some relationship with the railroad or its employees.

Traversing IHB's worksite, including this parking lot, "is a necessary incident of the day's work" for Arnold. *Caillouette*, 705 F.2d at 246, citing *Winfield*, 244 U.S. at 173. If Arnold's slip and fall had occurred mere feet away on the train tracks that cut through the parking area, the circumstances would be closely akin to *Winfield* and *Caillouette*, where FELA coverage was found. I question whether the distinction should turn on a question of mere feet, and, more importantly, whether I rather than a jury should make that call.

Both parties agree that Arnold was not yet on duty at the time of his fall, and for that reason was not yet wearing his protective gear including his spiked boots. There is no suggestion in the evidence that in these circumstances IHB expected its employees to don the boots as a safer alternative for crossing the lot, as in *Krysiak* where the railroad had specifically provided a stairway to give employees a safe method of leaving work. But the mere fact that Arnold was not yet on duty and had not yet begun his shift does not, of itself, preclude the application of FELA, as *Winfield*, *Caillouette*, and *Ponce* show. Whether Arnold's decision to exit his truck wearing sneakers instead of the spiked boots could support findings of comparative negligence is a question not shown to be

18

relevant to the motion before me, and so not reached.[1]

## Conclusion

All these competing considerations, even on the undisputed facts, yield a need to "select from among conflicting inferences and conclusions" that which is most reasonable. *Tennant*, 321 U.S. at 35. This is the work of a jury. Whether at the time Arnold slipped and fell he was within the scope of employment contemplated by FELA is a question on which reasonable people could disagree, so the question cannot be taken from the jury and decided on summary judgment. *Baker*, 359 U.S. at 228. Arnold's case presents something in between the "mere commuter" and a clear "rail yard accident," so that IHB does not establish as a matter of law that FELA does not apply. A jury must determine whether Arnold was sufficiently "engaged in his employment" to fall within FELA. *Quirk*, 189 F.2d at 98.

**ACCORDINGLY:**

Defendant Indiana Harbor Belt Railroad Company's motion for summary judgment [DE 25] is DENIED.

**SO ORDERED**.

ENTERED: January 30, 2024.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

---

[1] Arnold's reliance on other parties' injury claims against IHB (and IHB's defenses to them) is unhelpful, as Arnold does not establish that the facts of the three other matters are at all similar. [DE 30 at 9.] Similarly, I do not find helpful or persuasive Arnold's arguments concerning Union Pacific's rules about trespassers, about the consent counsel signed to enter the rail yard in another case, or matters about Rail Security Sensitive Material and High Threat Urban Areas. [DE 28 at 11, 12, 15.]